UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **KIMBERLY J. GEESLIN,** | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | **CASE NO. CV-06-B-0410-S** |
| | } | |
| **MORRISON MANAGEMENT** | } | |
| **SPECIALISTS, INC., a corporation;** | } | |
| **and DONALD J. MOTTERN, an** | } | |
| **individual,** | } | |
| | } | |
| Defendants. | } | |

**MEMORANDUM OPINION**

This case is presently pending before the court on defendant Donald J. Mottern's Motion for Summary Judgment, (doc. 14).[1] Plaintiff Kimberly J. Geeslin has sued Mottern, alleging assault and battery and invasion of privacy. Mottern contends that he is entitled to judgment as a matter of law on both of Geeslin's claims. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 14), is due to be denied.

**I.  SUMMARY JUDGMENT STANDARD**

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144,157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. V. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

  In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* At 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor.  *See id.* At 255.  Nevertheless, the non-moving party need not be given the benefit of every inference but only of every reasonable inference.  *See Brown v. City of Clewiston*, 848 F. 2d 1534, 1540 n. 12 (11th Cir. 1988).

## II.  STATEMENT OF FACTS[2]

Kimberly J. Geeslin began working for Morrison Management Specialists, Inc. ("Morrison") in 2002 as a management support employee.  (Doc. 23 at 6.)  Geeslin was employed at Morrison's Medical Center East location in Birmingham, Alabama.  (Doc. 19 at 1.)  Geeslin's direct supervisor was Donald J. Mottern from the time she was hired until Mottern was terminated on November 28, 2004.  (*Id.*)

When Geeslin and Mottern first began working together, Geeslin considered Mottern and his wife Kathy to be friends.  (Doc. 19 at 6.)  Before Mottern's inappropriate behavior began, Geeslin would visit Mottern's home and discuss her personal problems with Mottern and Kathy.  (*Id.*)  Geeslin also gave Mottern a ride home from work, volunteered to feed Mottern and Kathy's cat while they were out of town, and attended a social function at Mottern's house.  (*Id.*)  Mottern went to Geeslin's home to help her put ceramic tiles on her floor and to help her with a burst pipe.  (*Id.*)

In the summer of 2003, Mottern would engage in sexually explicit and unwelcome conversation with Geeslin almost every day.  (Doc. 19 at 7.)  Mottern regularly used the word "cunt."  (*Id.*)  In September 2003, Geeslin's fiancee David Orr heard Mottern speaking in a sexually explicit manner, and asked Mottern to mind his language.  (Doc. 23 at 7.)

---

[2]Although some statements of fact are disputed, the evidence is cited in the light most favorable to Geeslin, the non-moving party, and all reasonable inferences from admissible evidence are drawn in favor of Geeslin.  *See e.g., Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000).

Geeslin voiced her complaints to Mottern, but his behavior never showed any long-term signs of improvement. (Doc. 23 at 6-7.) On one occasion, Geeslin turned in her two weeks notice. (Doc. 23 at 7.) Mottern induced her to stay by promising her a raise (from $12.50 to $14.00 per hour), guaranteeing her forty hours pay per week regardless of how many hours she actually worked, not requiring her to use the time clock, giving her three weeks of vacation instead of two, and offering her a $200 per month "bonus" if her accounting figures reconciled with those of corporate. (*Id.*)

Near the end of 2003, Mottern was on the phone with Jack Wilder, another supervisor, when Geeslin asked Mottern to be nice to her. (Doc. 23 at 8.) Mottern told her that he did not have to be nice, and asked her what she was going to do about it. (Doc. 23 at 8.) Geeslin said she would quit. (*Id.*) Mottern said, "You know where the door is." (*Id.*) Geeslin picked up her things and left. (*Id.*) Mottern chased Geeslin down in the parking lot and apologized. (*Id.*) Geeslin complained about Mottern's treatment of her, and Mottern assured her it would not happen again. (*Id.*) Around this time, Mottern gave Geeslin another raise from $14.00 per hour to $16.00 per hour. (*Id.*)

Soon after this incident, Mottern asked Geeslin if she would "hook up" with his married friend from out of town. (*Id.*) Geeslin said that she would not. (*Id.*) Two weeks later, Mottern asked Geeslin to meet him at a hotel. (*Id.*) Geeslin refused. (*Id.*)

At the end of October 2003, Geeslin attended a party given by Rod Anders. (Doc. 19 at 8.) Mottern was present, but did not do anything that Geeslin found to be

disrespectful. (*Id.*) After the party, Geeslin, Mottern, and at least two other individuals went to Sammy's strip club and Tiki Bob's. (*Id.*) On another occasion in 2004, Geeslin, Mottern, and at least two others went to Sammy's again. (Doc. 19 at 9.)

In May 2004, Mottern frequently called or beeped Geeslin on weekends. (*Id.*) If Geeslin did not respond, Mottern would be hostile when he saw her at work. (Doc. 23 at 8-9.)

In July 2004, Pat Cowley, a male employee who reported to Mottern or Walter Thomas, was in Mottern's office. (Doc. 23 at 9.) When Geeslin walked into the room, Mottern said, "I smell a whore." (*Id.*) Geeslin went to the bathroom and cried. (*Id.*) Around this time, Mottern would often yell at Geeslin: "You want to cry, don't you – cry, cry, you know you want to cry." (*Id.*) If Geeslin responded with a dirty look, Mottern would say, "Get that look off your face or I will slap it off." (*Id.*)

From July 2004 to November 5, 2004, Mottern's behavior worsened. (*Id.*) He made comments in front of co-workers regarding her panties and what she was wearing. (*Id.*) When Geeslin asked Mottern why he embarrassed her, he responded that he did not want other employees to think she had it easy, that he was trying to toughen her up. (Doc. 23 at 9-10.)

On November 5, 2004, Mottern repeatedly asked Geeslin to "go fuck," and said, "come on, let's go fuck." (Doc. 23 at 10.) On that same day, while Geeslin, Mottern, and Jack Wilder were in Mottern's office, Mottern and Wilder were speaking in sexually

5

explicit terms. (*Id.*) Mottern told Wilder that Geeslin "liked to eat black pussy." (*Id.*) Mottern then grabbed her breasts with both hands, pulled out the elastic waistband of her skirt, and pulled up her panties. (*Id.*) Geeslin remembers Mottern making a comment about the color of her panties. (Geeslin dep. at 268.) Geeslin told Mottern to stop and asked him what he was doing. (Doc. 15 at 5.) The incident happened quickly, and Geeslin did not slap Mottern's hands away. (Geeslin dep. at 269.)

Later on the day of the incident, Gloria Davis, another supervisor, asked whether Mottern had everything covered on the days that Davis would be away from work. (*Id.*) Mottern responded, "Well, I need a blow job." (*Id.*) Wilder and Geeslin were present when Mottern made the comment, but Davis had walked away and probably did not hear. (*Id.*) For the remainder of the day, Mottern told Geeslin to hurry up with her work so that they could "go fuck." (*Id.*) Geeslin estimates that Mottern asked her to "go fuck" about ten times during the day. (*Id.*) Mottern was mean to Geeslin throughout the remainder of the day. (Doc. 23 at 11.) He called her into his office and told her to "get [her] ass off of [her] shoulders," and to "cry, cry, you know you want to." (*Id.*)

On November 11, 2004, Geeslin reported Mottern's behavior to Morrison's 1-800 hotline, known as its "Be Aware Hotline." (*Id.*) Morrison conducted an investigation, and Mottern was terminated on November 28, 2004. (*Id.*) Geeslin filed her Complaint against Mottern and Morrison on February 28, 2006. (Doc. 1.)

### III.  DISCUSSION

Counts IV and V of Geeslin's Complaint allege state law tort claims of assault and battery and invasion of privacy against Mottern.[3]  (Doc. 1, ¶¶46-52.)  Mottern contends that he is entitled to summary judgment on both claims.  (Doc. 15 at 2.)

#### *A.  Assault and Battery*

"The plaintiff in an action alleging assault and battery must prove: '(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner.'"  *Harper v. Winston County*, 892 So.2d 346, 353 (Ala. 2004) (quoting *Ex parte Atmore Community Hospital*, 719 So.2d 1190, 1193 (Ala. 1998)).  A plaintiff may establish "that the touching was conducted in a harmful or offensive manner" by showing that the touching was conducted with sexual overtones and was unwelcome.  *Atmore Community Hospital*, 719 So.2d at 1194.

For example, in *Atmore Community Hospital*, the plaintiff presented evidence that her co-employee "touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg."  *Id*.  The plaintiff also "presented evidence indicating that each . . . touching was intentional, was conducted with sexual overtones, and was unwelcome."  *Id*.  The Alabama Supreme Court held that

---

[3]Counts I, II, and III allege claims only against Morrison.  (Doc. 1.)

"[t]hese factual assertions constituted substantial evidence that [plaintiff's co-employee] committed a battery." *Id.*

In the present case, Geeslin has presented evidence that Mottern intentionally grabbed her breasts and pulled up her panties. (Doc. 23 at 10.) She has also presented evidence that Mottern's actions were conducted with sexual overtones and were unwelcome.

The sexual overtones are apparent from Mottern's actions and his comments before, during and after his actions. Geeslin testified that Mottern repeatedly asked her to "go fuck" on the day of the incident. (*Id.*) She also testified that, immediately prior to grabbing her breasts and panties, Mottern told Wilder that Geeslin "liked to eat black pussy." (*Id.*) Geeslin also testified that Mottern made a comment about the color of her panties either while he pulled them up, or immediately after pulling them up. (Geeslin dep. at 268.) Later on the day of the incident, Mottern said that he needed a blow job in the presence of Geeslin and Wilder.

That Mottern's actions were unwelcome is clear from the fact that Geeslin told Mottern to stop, and reported the incident to Morrison's "Be Aware Hotline" six days later. (Doc. 15 at 5.) Although she did not slap his hand away, the incident happened quickly. (Geeslin dep. at 269.) Furthermore, Geeslin testified that she was "totally devastated and shocked" by the incident. Consequently, plaintiff establishes a prima facie

case of assault,[4] and battery,[5] and defendant's Motion for Summary Judgment is due to be denied.

### B. *Invasion of Privacy*

"To succeed on a claim alleging invasion of privacy relating to sexual harassment, a plaintiff must show: (1) that the matters intruded into are of a private nature; and (2)

---

[4]Mottern argues that he could not have committed an assault because Geeslin could not have been in fear of imminent contact. (Doc. 15 at 9-10.) Mottern contends that Geeslin could not have been in fear of imminent contact because she did not know that Mottern was going to touch her, and was surprised by the touching. (Doc. 15 at 9-10.) Mottern's argument stems from the definition of assault: "Under Alabama law, assault consists of an intentional, unlawful offer to touch a person coupled with the present ability to do so, such that the words or action create a reasonable fear of imminent contact." *Morrow v. Auburn University at Montgomery*, 973 F.Supp. 1392, 1409 (M.D. Ala. 1997) (citing *Holcombe v. Whitaker*, 318 So.2d 289, 194 (Ala. 1975)). However, as Geeslin points out, when Mottern grabbed her panties, she reasonably feared additional imminent contact. (Doc. 23 at 13.) That fear of additional contact was materialized when Mottern pulled Geeslin's panties out of her skirt. (*Id.*) Furthermore, the law is clear that "[e]very battery includes an assault." *Whitlow v. Bruno's, Inc.*, 567 So.2d 1235, 1239 (Ala. 1990) (quoting *Western Union Telegraph Co. v. Hill*, 150 So. 709, 710 (Ala. Civ. App. 1933)). Therefore, in *Portera v. Winn Dixie of Montgomery*, there was a question of fact as to plaintiff's assault and battery claim despite the plaintiff being "surprised" and "shocked" when the defendant put his hand in her blouse. *Portera*, 996 F.Supp. 1418, 1437 (M.D. Ala. 1998).

[5]The court notes that the battery cases cited by Mottern are distinguishable on the facts. In *Hanes v. Mobile Infirmary Medical Center*, the defendant supervisor briefly placed his hand on the plaintiff employee's leg during an evaluation of the employee, and attempted to kiss her at the conclusion of their conversation. *Hayes*, 2005 WL 1840236, *7 (S.D. Ala. 2005). The employee turned her head, and the attempted kiss landed on her neck. *Id.* The defendant did not say anything ugly or of a sexual nature during the meeting. *Id.* at *1. Furthermore, the plaintiff did not in any way advise the supervisor that his conduct was unwelcome, and did not report the incident for over a month. *Id.* at *8. In *Simmons v. Mobile Infirmary Medical Center*, the plaintiff alleged that the defendant touched her breast four to five times. *Simmons*, 391 F.Supp.2d 1124, 1128 (S.D. Ala. 2005). However, the plaintiff "never advised [the defendant] in any manner that his conduct was unwelcome." *Id.* at 1130-31. Furthermore, the defendant "never said anything to [the plaintiff] of a sexual nature." *Id.* at 1128. *Hanes* and *Simmons* clearly involved very different facts than the present case. The defendants' conduct in those cases was not as extreme as Mottern's, and the plaintiffs in those cases did nothing to show that the defendants' conduct was unwelcome.

that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation." *Atmore Community Hospital*, 719 So.2d at 1194 (citing *Busby v. Truswal Systems Corp.*, 551 So.2d 322, 323 (Ala. 1989)). "'Marriage' and 'sexual' concerns . . . are entitled to privacy protection." *Busby*, 551 So.2d 322, 324 (citing *Eisenstadt, Sheriff v. Baird*, 405 U.S. 438 (1972)). "While asking a co-employee for a date and making sexual propositions usually do not constitute an invasion of privacy, extensive inquiries into one's sex life or looking up one's skirt may constitute an invasion of privacy." *Atmore Community Hospital*, 719 So.2d at 1194 (internal citations omitted). A number of Alabama Supreme Court cases guide this court in determining whether Mottern's sexual harassment of Geeslin may constitute an invasion of privacy.

In *Atmore Community Hospital*, the plaintiff put forth evidence that her co-employee made lewd comments, asked her to meet him outside of work hours, and looked up her skirt on more than one occasion. *Atmore Community Hospital*, 719 So.2d at 1194. "These factual assertions constituted substantial evidence that [the co-employee] committed an invasion of privacy." *Id.*

In *Busby*, female employees sued their employer for invasion of privacy. *Busby*, 551 So.2d 322. The plaintiffs in *Busby* presented evidence suggesting that their supervisor:

> (1) invited Busby and Money to swim in his pool in the nude with him; (2) told Busby his hands were cold and asked if he could put

> them in her pockets to keep them warm; (3) told the plaintiffs that he would 'put a stick on their machines' so they could masturbate while working; (4) said that he could perform intercourse as fast as one of the machines at the plant could operate; (5) said that he wished that the plaintiffs would come to work braless and wear less clothing; (6) told one of the plaintiffs that if she had not stayed up all night having sex she could do her work properly; (7) told one employee that if she would give him 30 minutes with her that he would fill her pants in nine months for her; (8) acted as if he was going to pinch one plaintiff's breasts with a pair of pliers and with his hands; (9) said that he should send one of the plaintiffs across the street to where a group of men were standing because she stayed sexually aroused all of the time; (10) told one of the plaintiffs that he was very tired and asked her if she would accompany him to the restroom and hold his penis while he urinated; (11) told one of the plaintiffs that her nipples were as large as another employee's entire breasts; (12) attempted to follow one of the plaintiff's into the restroom and when she asked him where he was going, said that he was going to help her; (13) followed one of the plaintiffs one night; (14) said that a table in his office had been damaged when one of the plaintiffs and a male co-employee had sex on top of it; (15) openly stared at the plaintiffs' sexual anatomy; (16) put his arm around the plaintiffs, grabbed their arms, and stroked their necks; and (17) made other lewd remarks and gestures to the plaintiffs.

*Busby*, 551 So.2d at 324. The court held that "[a] jury could reasonably determine from this evidence that [the supervisor] pried or intruded into the plaintiffs' sex lives in an offensive or objectionable manner and thereby invaded their right of privacy." (*Id.*)

In *Phillips v. Smalley Maintenance Services*, the employer repeatedly and in "a repulsive manner" inquired about the plaintiff's sexual relationship with her husband, "struck her across the buttocks," and made sexual advances toward the plaintiff. *Phillips*, 435 So.2d 705, 711 (Ala. 1983). The court held that these facts would support an invasion of privacy claim. *Id.*

On the other hand, in *McIsaac v. WZEW-FM Corp.* and *Logan v. Sears, Roebuck & Co.*, the defendants' conduct was not outrageous enough to maintain an invasion of privacy claim. In *McIsaac*, the "employer repeatedly asked a female employee to 'be available,' tried to kiss her several times, and later attempted to have her fired for resisting his advances." *Brassfield*, 915 F.Supp. 1438, 1456 (citing *McIsaac*, 495 So.2d 649, 650 (Ala. 1986)). In *Logan*, an employee told someone over the phone that plaintiff was "as queer as a three-dollar bill." *Logan*, 466 So.2d 121, 122 (Ala. 1985).

In light of the foregoing cases, a reasonable jury could find that Mottern's sexual harassment of Geeslin was sufficiently outrageous to support a claim for invasion of privacy. Geeslin has presented evidence that Mottern:

> 1) would engage in sexually explicit and unwelcome conversation with Geeslin almost every day, regularly using the word "cunt";
>
> 2) asked Geeslin to "hook up" with a married friend of his from out of town;
>
> 3) said, "I smell a whore" after Geeslin walked into his office when Pat Cowley, another employee, was present;
>
> 4) made comments in front of co-workers regarding Geeslin's panties and clothes;
>
> 5) repeatedly asked Geeslin to "go fuck," and said, "come on, let's go fuck" on November 5, 2004;
>
> 6) spoke to Wilder in sexually explicit terms while Geeslin was present;
>
> 7) said to Wilder that Geeslin "liked to eat black pussy" while Geeslin was present;

>   8) grabbed Geeslins's breasts with both hands, pulled out the elastic waistband of her skirt, pulled up her panties, and made a comment about the color of her panties;
>
>   9) said, "I need a blow job" in the presence of Geeslin and Wilder in response to Davis asking whether Mottern had everything covered while she was out of town;
>
>   10) and asked Geeslin to go to a hotel with him.

(Doc. 23 at 6-11; Geeslin dep. at 273, 334-35.)  Geeslin's evidence, if believed, suggests that Mottern intruded into her private, sexual concerns in a way that was "so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation."  *See Atmore Community Hospital*, 719 So.2d at 1194. Therefore, Mottern's Motion for Summary Judgment is due to be denied as to Geeslin's invasion of privacy claim.

## IV.  CONCLUSION

 For the foregoing reasons, the court is of the opinion that there are material facts in dispute and defendant is not entitled to judgment as a matter of law.  An order denying defendant's motion for summary judgment will be entered contemporaneously with this Memorandum Opinion.

 **DONE**, this the 13th day of August, 2007.

*Sharon Lovelace Blackburn*
—————————————————
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE