FILED

2007 Aug-13  PM 04:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **KIMBERLY J. GEESLIN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **CASE NO. CV-06-B-0410-S** |
| | } | |
| **MORRISON MANAGEMENT** | } | |
| **SPECIALISTS, INC., a corporation;** | } | |
| **and DONALD J. MOTTERN, an** | } | |
| **individual,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant Morrison

Management Specialists, Inc.'s ("Morrison") Motion for Summary Judgment, (doc. 18).[1]

Plaintiff Kimberly J. Geeslin has sued Morrison, alleging claims of hostile work

environment, retaliation, and negligent hiring, training, supervision, and retention.

Morrison contends that it is entitled to judgment as a matter of law on all of Geeslin's

claims.  Upon consideration of the record, the submissions of the parties, the arguments

of counsel, and the relevant law, the court is of the opinion that defendant's Motion for

Summary Judgment, (doc. 18), is due to be granted as to Geeslin's hostile work

environment and negligent hiring, training, supervision, and retention claims.

Defendant's Motion for Summary Judgment, (doc. 18), is due to be denied as to Geeslin's

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record.

retaliation claim.

## I. STATEMENT OF FACTS[2]

Kimberly J. Geeslin ("Geeslin") began working for Morrison Management Specialists, Inc. ("Morrison") in 2002 as a management support employee.  (Doc. 23 at 6.)  Geeslin was employed at Morrison's Medical Center East location in Birmingham, Alabama.  (Doc. 19 at 1.)  Geeslin's direct supervisor was Donald J. Mottern ("Mottern") from the time she was hired until he was terminated on November 28, 2004.  (*Id.*)

Morrison has a Workplace Harassment and Sexual Harassment Policy ("Anti-Harassment Policy") which clearly defines sexual harassment.  (Doc. 19 at 1.)  The Anti-Harassment Policy provides that if an employee feels he or she is being harassed, that employee is expected to bring a complaint using Morrison's open communication policy. (Doc. 19 at 1-2.)  The Anti-Harassment Policy explains that, although the associate's immediate supervisor is the best person to approach with a complaint, if the associate feels uncomfortable talking with the supervisor, the associate may go to the next level of management or the Regional Vice President.  (Doc. 19 at 2.)  The associate may also call the "Be Aware Hotline" or the Company Ombudsman.  (*Id.*)  The Anti-Harassment Policy also contains an anti-retaliation clause, advising employees that Morrison does not retaliate against employees who report harassment.  (*Id.*)

---

[2]Although some statements of fact are disputed, the evidence is cited in the light most favorable to plaintiff, the non-moving party, and all reasonable inferences from admissible evidence are drawn in favor of plaintiff.  *See e.g., Patrick v. Floyd Med. Ctr.*, 201 F.3d 1313, 1315 (11th Cir. 2000).

The Anti-Harassment Policy is required to be posted on the bulletin boards at each of Morrison's sites. (*Id.*)  A condensed version of the policy is included in the Employee Handbook, which is distributed to all associates. (*Id.*)  Every year, the Anti-Harassment Policy is redistributed to all associates, and associates are required to sign for the policy. (*Id.*)  All Morrison units are also required to conduct monthly chat sessions on different topics. (*Id.*)  At least once every year, the topic for a chat session is sexual harassment training. (*Id.*)

Shortly after Geeslin was hired, she received a copy of Morrison's Anti-Harassment Policy. (Doc. 19 at 5.)  She signed an acknowledgment that she had received and read the policy. (*Id.*)  She signed a second acknowledgment in October 2003. (*Id.*)

Morrison's "Be Aware Hotline" is operated by a third-party vendor, Global Compliance Services, who monitors and records all information provided by the calling employee, then forwards the information to Compass Group's[3] legal department. (Doc. 19 at 2-3.)  Although complaints may be made anonymously, the employee must provide sufficient information on the location where she works so that the complaint can be referred to the appropriate Human Resources Manager. (Doc. 19 at 3.)  Field Human Resources Managers cover different zones when dealing with employee relations issues. (*Id.*)  Depending on the location of the call, the legal department forwards the complaint to the appropriate Human Resources Manager for follow-up and investigation. (*Id.*)  All

---

[3]Compass Group acquired Morrison in 2001. (Menard at ¶3.)

employees receive a Be Aware wallet card and a Be Aware poster hangs in each unit. (*Id.*)

Morrison has an Open Communication Policy.  (*Id.*)  Employees are encouraged to raise any concerns with their immediate supervisor.  (*Id.*)  If an employee prefers to bypass their immediate supervisor, the Open Communication Policy directs them to raise their concerns with the next level of management or with the Human Resources Department.  (*Id.*)

Morrison publishes and distributes to each employee an Associate Handbook. (Doc. 19 at 4.)  The Associate Handbook contains Morrison's Work Rules and Attendance Policy, Equal Employment Opportunity Policy, Anti-Harassment Policy, and Open Communication Policy.  (*Id.*)  Geeslin remembers receiving a copy of the Associate Handbook at the time she was hired, and she was aware of the section dealing with harassment.  (*Id.*)  Geeslin's job duties included, among other things, processing new hires and maintaining employee files, which required her to handle Morrison's basic new hire paper work.  (*Id.*)

In late 2003 or early 2004, Morrison implemented an Ombudsman Program.  (*Id.*) Morrison used payroll stuffers to introduce its employees to Ombudsman Phil Wells. (*Id.*)  In the summer of 2004, Morrison hired a second Ombudsman.  (*Id.*)

Mary Menard is the Human Resources Manager responsible for receiving, investigating, and determining the appropriate course of action for complaints filed by

employees within Florida, Alabama, and South Georgia.  (Doc. 19 at 3.)  Mary Menard is

also responsible for conducting Human Resources Assessments, Training, and File Audits

at her designated units.  (Doc. 19 at 4.)  On October 25, 2002, shortly after Geeslin was

hired, Menard conducted a Human Resources Assessment at the Medical Center East

location.  (Doc. 19 at 5.)  Menard posted a Be Aware poster in the unit.  (*Id.*)  During

visits to her designated units, it is standard practice for Menard to walk around and ensure

that all required postings are hanging in the units.  (*Id.*)  On January 21, 2004, Menard

conducted a File Audit at Medical Center East.  (*Id.*)  Menard did her usual walk around

and observed that a Be Aware poster was still posted in the unit.  (*Id.*)

When Geeslin and Mottern first began working together, Geeslin considered

Mottern and his wife Kathy to be friends.  (Doc. 19 at 6.)  Before Mottern's inappropriate

behavior began, Geeslin would visit Mottern's home and discuss her personal problems

with Mottern and his wife.  (*Id.*)  Geeslin also gave Mottern a ride home from work,

volunteered to feed the Motterns' cat while they were out of town, and attended a social

function at Mottern's house.  (*Id.*)  Mottern went to Geeslin's home to help her put

ceramic tiles on her floor and to help her with a burst pipe.  (*Id.*)

In the summer of 2003, Mottern would engage in sexually explicit and unwelcome

conversation with Geeslin almost every day.  (*Id.*)  Mottern regularly used the word

"cunt."  In September 2003, Geeslin's fiancee David Orr heard Mottern constantly

speaking in a sexually explicit manner, and Orr asked Mottern to mind his language.

(Doc. 23 at 7.)

Geeslin voiced her complaints to Mottern, but his behavior never showed any long-term signs of improvement.  (Doc. 23 at 6-7.)  On one such occasion, Geeslin turned in her two weeks notice.  (Doc. 23 at 7.)  Mottern induced her to stay by promising her a raise (from $12.50 to $14.00 per hour), guaranteeing her forty hours pay per week regardless of actual hours worked, not requiring her to use the time clock,[4] giving her three weeks of vacation instead of two, and offering her a $200 per month "bonus" if her accounting figures reconciled with those of corporate.  (*Id.*)

Near the end of 2003, Mottern was on the phone with Jack Wilder, a supervisor, when Geeslin asked Mottern to be nice to her.  (Doc. 23 at 8.)  Mottern told her that he did not have to be nice, and asked her what she was going to do about it.  (Doc. 23 at 8.)  Geeslin said she would quit.  (*Id.*)  Mottern said, "You know where the door is."  (*Id.*)  Geeslin picked up her things and left.  (*Id.*)  Mottern chased Geeslin down in the parking lot and apologized.  (*Id.*)  Geeslin complained about Mottern's treatment of her, and Mottern assured her it would not happen again.  (*Id.*)  Around this time, Mottern gave Geeslin another raise from $14.00 per hour to $16.00 per hour.  (*Id.*)

Soon after this incident, Mottern asked Geeslin if she would "hook up" with a married friend of his from out of town.  (*Id.*)  Geeslin said that she would not.  (*Id.*)  Two weeks later, Mottern asked Geeslin to meet him at a hotel.  (*Id.*)  Geeslin refused.  (*Id.*)

---

[4]When Geeslin was hired in 2002, she started in the role of Management Support, and was required to clock in and clock out.  (Doc. 19 at 5.)

At the end of October 2003, Geeslin attended a party given by Rod Anders.  (Doc. 19 at 8.)  Mottern was present, but did not do anything that Geeslin found to be disrespectful.  (*Id.*)  After the party, Geeslin, Mottern, and at least two other individuals went to Sammy's strip club and Tiki Bob's.  (*Id.*)  On another occasion in 2004, Geeslin, Mottern, and at least two others went to Sammy's again.  (Doc. 19 at 9.)

In May 2004, Mottern frequently called or beeped Geeslin on weekends.  (*Id.*)  When Geeslin did not respond, Mottern would be hostile when he saw her at work.  (Doc. 23 at 8-9.)

In July 2004, Pat Cowley, a male employee who reported to Mottern or Walter Thomas, was in Mottern's office.  (Doc. 23 at 9.)  When Geeslin walked into the room, Mottern said, "I smell a whore."  (*Id.*)  Geeslin went to the bathroom and cried.  (*Id.*)  Around this time, Mottern would often yell at Geeslin: "You want to cry, don't you – cry, cry, you know you want to cry."  (*Id.*)  If Geeslin responded with a dirty look, Mottern would say, "get that look off your face or I will slap it off."  (*Id.*)

From July 2004 to November 5, 2004, Mottern's behavior worsened.  (*Id.*)  He made comments in front of co-workers regarding her panties and what she was wearing.  (*Id.*)  When Geeslin asked Mottern why he embarrassed her, he responded that he did not want them to think she had it easy, that he was trying to toughen her up.  (Doc. 23 at 9-10.)

On November 5, 2004, Mottern repeatedly asked Geeslin to "go fuck," and said,

"come on, let's go fuck." (Doc. 23 at 10.) On that same day, while Geeslin, Mottern, and Wilder were in Mottern's office, Mottern and Wilder were speaking in sexually explicit terms. (*Id.*) Mottern told Wilder that Geeslin "liked to eat black pussy." (*Id.*) Mottern then grabbed her breasts with both hands, pulled out the elastic waistband of her skirt, and pulled up her panties. (*Id.*) Geeslin remembers Mottern making a comment about the color of her panties. (Geeslin dep. at 268.) Geeslin told Mottern to stop and asked him what he was doing. (Doc. 15 at 5.) The incident happened quickly, and Geeslin did not slap Mottern's hands away. (Geeslin dep. at 269.)

Later on the day of the incident, Gloria Davis, another supervisor, inquired as to whether Mottern had everything covered while Davis was away from work. (Doc. 23 at 10.) Mottern responded, "Well, I need a blow job." (*Id.*) Wilder and Geeslin were present when Mottern made the comment, but Davis probably did not hear it. (*Id.*) For the remainder of the day, Mottern told Geeslin to hurry up with her work so that they could "go fuck." (*Id.*) Geeslin estimates that Mottern asked her to "go fuck" about ten times during the day. (*Id.*) Mottern was mean to Geeslin throughout the remainder of the day. (Doc. 23 at 11.) He called her into his office and told her to "get [her] ass off of [her] shoulders," and to "cry, cry, you know you want to." (*Id.*)

On November 11, 2004, Geeslin reported Mottern's behavior to Morrison's "Be Aware Hotline." (*Id.*) Prior to this report, Geeslin had never reported a problem to Menard, the Human Resources Manager, and Menard had never received a complaint

regarding Mottern.  (Doc. 19 at 12.)

On November 12, 2004, the day after Geeslin's complaint, Menard called Geeslin at home to discuss the complaint.  (*Id.*)  Menard told Geeslin to stay home so she could investigate Geeslin's complaint.  (*Id.*)  Menard immediately flew to Birmingham and began her investigation on November 15, 2004.  (*Id.*)  Menard then called Geeslin and told her that she could return to work the next day, and that Mottern would be put on leave until the investigation was complete.  (*Id.*)  The investigation lasted throughout the week, and included interviews and written statements from Geeslin, Mottern, Jack Wilder, Sonya Grisham, and Pat Cowley.  (*Id.*)

Based on Menard's investigation, Mottern was terminated on November 30, 2004. (Doc. 19 at 13.)  From the date of her complaint until the date of Mottern's termination, Geeslin never had to work with or be in the presence of Mottern.  (*Id.*)

On November 22, 2004, Walter Thomas became the acting director at Medical Center East.  (*Id.*)  On December 1, 2004, the pictures in Geeslin's office were turned around and someone had written on her calendar, "payback is a bitch" and "I know u, u don't know me."  (*Id.*)  Geeslin also realized that her personnel file was missing.  (*Id.*) Geeslin reported the incident to Menard.  (*Id.*)  Menard contacted Mottern, who denied taking any of these actions.  (*Id.*)

On December 2, 2004, Geeslin met with Rod Anders, Sonya Grisham, and Walter Thomas.  (Doc. 22 at 10.)  At the meeting, Walter Thomas informed Geeslin that

Morrison had eliminated the $200 per month bonus given by Mottern.  (*Id.*)  Geeslin was also informed that she would have to use the time clock and would have two rather than three weeks of vacation.[5]  (*Id.*)  Geeslin was informed that her job duties would be altered, though they never were actually altered.  (Doc. 22 at 11; Geeslin dep. at 159.)

After the meeting, Geeslin noticed changes in Thomas's actions toward her.  (Doc. 22 at 11.)  According to Geeslin, Thomas would often walk into her office and stare at her, not saying anything.  (*Id.*)  If Geeslin said, "what?", Thomas would not respond.  (*Id.*)  On one occasion, Thomas called Geeslin into his office, inquired as to her whereabouts, and accused her of having gone to a doctor's appointment.  (*Id.*)  Geeslin contends that she had not been away from her desk for more than ten minutes.  (*Id.*)  Thomas also asked Sonya Grisham to speak with Geeslin about her attire.  (*Id.*)  Geeslin was told that her sleeveless shirts did not comport with the dress policy, that she dressed too casually, and that she needed to wear pantyhose.  (*Id.*)  Geeslin contends that other employees wear sleeveless shirts and do not wear pantyhose.  (*Id.*)

Around October 2005, Geeslin talked to Thomas about why she had not received a salary raise for the year.  (Doc. 19 at 15.)  Thomas explained that she was maxed out in her pay grade.  (*Id.*)  Prior to Geeslin talking to Thomas about a raise, she had been promoted by Mottern from Office Coordinator to Accounting Supervisor, Management Support Specialist.  (*Id.*)  This change in title was accompanied by a raise from $12.50 to

---

[5]In 2003, Mottern told Geeslin that she did not have to use the time clock, and increased her vacation from two weeks to three weeks.

$14.00 per hour.  (*Id.*)  Later, Mottern had again changed Geeslin's title to Systems

Account Manager and given her a raise from $14.00 to $16.00 per hour.  (*Id.*)  Geeslin

later received an annual salary raise to $16.80 per hour.  (*Id.*)  Geeslin told Thomas that

she should not be classified as an Office Coordinator because Mottern had changed her

title to Systems Account Manager.  (*Id.*)  Thomas explained that Mottern had no authority

to change her title.  (*Id.*)  Furthermore, the positions Accounting Supervisor, Management

Support Specialist and Systems Account Manager do not exist in the Compass Group

payroll system.[6]  (Doc. 19 at 16.)  However, even if Geeslin had been classified as an

Office Coordinator, she would still have been maxed out in salary in October 2005 when

she requested a raise.  (*Id.*)

Geeslin filed a Charge of Discrimination with the Equal Employment Opportunity

Commission on April 29, 2005.  (Doc. 1 at 2.)  Geeslin filed her Complaint on February

28, 2006.  (Doc. 1.)  Counts I, II, and III of Geeslin's Complaint allege claims against

Morrison for hostile work environment, retaliation, and negligent hiring, training,

supervision and retention.[7]  (*Id.*)

## II.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the

---

[6]During her employment with Morrison at Medical Center East, Geeslin was coded in
Compass Group's payroll system as a "Food Unit Lead."  (*Id.*)  Prior to that, she was classified as
"Office Personnel."  (*Id.*)

[7]Counts IV and V allege claims against Mottern for assault and battery and invasion of
privacy.  (*Id.*)

record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144,157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. V. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* At 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* At 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every reasonable inference. *See Brown v. City of Clewiston*, 848 F. 2d 1534, 1540 n. 12 (11th Cir. 1988).

### III.  DISCUSSION

Geeslin alleges that Morrison subjected her to a hostile work environment,

12

retaliated against her in response to her complaints, and was negligent in the hiring, training, supervision, and retention of Mottern.  Morrison contends that it is entitled to judgment as a matter of law on all of Geeslin's claims.  The court will address each claim in turn.

### A. Hostile Work Environment

Geeslin's hostile work environment claim is based on her allegations of sexual harassment by Mottern, her supervisor.  (Doc. 22 at 13.)  Generally, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."  *Mandray v. Public Supermarkets, Inc.*, 208 F.3d 1290, 1296 (11th Cir. 2000) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)); *see also Burlington Industries v. Ellerth*, 524 U.S. 742 (1998).  However, in *Faragher* and *Burlington Industries*, the Supreme Court "created an affirmative defense providing employers a safe harbor from vicarious liability when the victimized employee suffered no adverse tangible employment action."[8]  *Id.*  The employer must satisfy two elements to successfully interpose the *Faragher* affirmative defense: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b)

---

[8]This affirmative defense is unavailable when the supervisor's harassment culminates in a tangible adverse employment action, such as discharge, demotion, or undesirable reassignment. *See Faragher*, 524 U.S. at 808.  In the present case, the only tangible employment actions taken by Mottern were promotions and raises.  Therefore, the *Faragher* defense is available to Morrison.

that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 1296-97.

In the present case, Morrison meets the first requirement for the *Faragher* defense by showing that it promulgated its Anti-Harassment Policy and acted promptly to stop Mottern's harassment once it received Geeslin's complaint.  It is undisputed that Morrison had an anti-harassment policy and disseminated the policy's complaint procedures.  Morrison's Anti-Harassment Policy provides the following means of reporting harassment: 1) Morrison's Open Communication Policy, which encourages employees to raise problems with their supervisor, or if they feel uncomfortable speaking to their supervisor, with the next level of management or with the Human Resources Department; 2) Morrison's "Be Aware Hotline," which allows employees to make anonymous complaints to a third-party vendor, who then relays the information to the Compass Group's legal department; and 3) Morrison's Ombudsman Program, which allows employees to call the Company Ombudsman with their complaints.  The Eleventh Circuit has found similar policies to be reasonable.  *See Coates v. Sundor Brands*, 164 F.3d 1361, 1364 (11th Cir. 1999) (policy directing employees to report sexual harassment to their "line manager, Personnel Contact or other manager with whom they feel comfortable" was a reasonable policy); *Madras*, 208 F.3d at 1298-99 (policy directing employees to report sexual harassment to "the Store Manager, District Manager, or

14

Divisional Personnel Managers," or "anyone in management" was a reasonable policy).

Morrison disseminated its Anti-Harassment Policy in a number of ways: 1) it posted the policy on the bulletin board at the Medical Center East site; 2) it included the policy in the Employee Handbook, which is distributed to all associates; 3) it redistributed the policy each year, and required its associates to sign for the policy; and 4) at least once a year, Morrison conducted a chat session on sexual harassment. *See Madras*, 208 F.3d at 1294. Geeslin admits that she received and signed the policy. (Geeslin dep. at 183-92 .)

Furthermore, Morrison acted promptly in responding to Geeslin's complaint and correcting the harassment. Geeslin first reported Mottern's harassment to Mary Menard on November 11, 2004 through Morrison's "Be Aware Hotline." Menard called Geeslin within 24 hours to discuss Geeslin's complaints, and advised Geeslin to stay home the following Monday so that Menard could investigate. Menard flew to Birmingham two days later, and began investigating Geeslin's complaints on November 15, 2004. Menard then advised Geeslin to return to work, and required Mottern to stay home. As a result of Menard's investigation, Mottern was terminated on November 30, 2004. From the time that Geeslin first complained until the time that Mottern was terminated, Geeslin never had to work with or be in the presence of Mottern.

The second requirement for the *Faragher* defense is met because Geeslin failed to fulfill her obligation of reasonable care to avoid the harm created by Mottern's harassment. "Once an employer has promulgated an effective anti-harassment policy and

disseminated that policy and associated procedures to its employees, then it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and grievances." *Madras*, 280 F.3d at 1300 (internal citations and quotation marks omitted). "While proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Faragher*, 524 U.S. at 807-08.  If Geeslin was, as she alleges, subjected to a hostile work environment over a period of time, it was incumbent upon her to utilize Morrison's reporting procedures.  It is undisputed that Geeslin did not utilize any of Morrison's clearly established procedures for reporting sexual harassment until November 12, 2004, when Morrison acted promptly in responding to her complaint. (Doc. 19 at 11-12.)  Therefore, the second requirement of the *Faragher* defense is satisfied.

Even if Mottern created a hostile work environment, Morrison is entitled to interpose the *Faragher* defense to eliminate its vicarious liability.  Morrison promulgated and disseminated an effective sexual harassment policy with appropriate complaint procedures.  When Morrison received Geeslin's complaint, it promptly corrected Mottern's sexually harassing behavior.  Furthermore, Geeslin unreasonably delayed her use of Morrison's complaint procedure.  Consequently, summary judgment is due to be

16

granted as to Geeslin's hostile work environment claim.

### B. Retaliation

In order to establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. *Stavropoulos v. Firestone*, 361 F.3d 610, 616 (11th Cir. 2004).  If a plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate reason for the adverse employment action.  *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).  "If the defendant does so, the plaintiff must show that the reasons the defendant gave were pretextual."  *Id.*

Geeslin engaged in protected activity when she reported Mottern's sexual harassment to Morrison on November 11, 2004.  Considering Mottern's conduct, especially the final incident of grabbing Geeslin's breasts and pulling her panties, there is sufficient evidence for a jury to find that Geeslin subjectively and reasonably believed that she was the victim of sexual harassment when she complained to Morrison.

Geeslin alleges a number of adverse employment actions.  According to Geeslin, Morrison retaliated against her by informing Geeslin that her job duties would be changing, removing her $200 per month bonus, requiring her to use the time clock, reducing her vacation time from three weeks per year to two weeks per year, reducing her wellness time, and informing her that she would not be receiving a raise because she had

17

maxed out at her position.  (Doc. 22 at 19.)  The court agrees that reducing Geeslin's vacation and wellness time and removing her bonus are adverse employment actions because these actions impact the "terms, conditions, or privileges" of Geeslin's employment in a "real and demonstrable way."[9]  *Davis v. Town of Lake Park*, 245 F.3d 1232, 1232 (11th Cir. 2001); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).  On the other hand, informing her that her duties would be changing, requiring her to use the time clock, and informing her that she would not be receiving a raise were not adverse employment actions.  Geeslin admits that her job duties were never changed. She also agrees that she should have been required to use the time clock like other employees at her level.  Informing Geeslin that she would not be receiving a raise was not an adverse employment action because she has offered no evidence that she was even eligible for a raise.[10]  *See, e.g., Smith v. Alabama Dept. of Public Safety*, 64 F.Supp.2d 1215, 1222 (M.D. Ala. 1999).

　　To establish a causal connection, a plaintiff must show that "the decision-maker[s] [were] aware of the protected conduct," and "that the protected activity and the adverse

_____

[9]Geeslin's $200 bonus, awarded monthly, was taken away in 2004.  Therefore, the court finds that it is not de minimis.

[10]Even if informing Geeslin that she would not be receiving a raise constitutes an adverse employment action, Morrison has articulated a legitimate reason for its action. Morrison contends that she was maxed out at her position, and would have been at her maximum pay regardless of whether or not Mottern had the authority to change her position title.  (Doc. 19 at 16, 28.)  Geeslin has offered no evidence to suggest that this reason is false or in any way a pretext for unlawful retaliation.

action were not wholly unrelated." *Gupta*, 212 F.3d at 590. "For purposes of a prima facie case, 'close temporal proximity' may be sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'" *Id.* (quoting *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999)). The adverse employment actions were taken on December 2, 2004, during a meeting with Rod Anders, Sonya Grisham, Walter Thomas, and Geeslin. Because Sonya Grisham was interviewed by Menard with regard to Mottern's harassment, and attended the meeting where the adverse actions were taken, there is an issue of fact that the decision-makers were aware of Geeslin's protected activity. (Doc. 19 at 12; doc. 22 at 10.) Furthermore, because the actions were taken approximately three weeks after Geeslin's protected activity, temporal proximity is sufficient to establish a causal connection.

Morrison has produced evidence that articulates a legitimate, non-discriminatory reason for taking away Geeslin's wellness time. According to Morrison, the wellness time was unearned and unauthorized. Mary Menard, the Human Resources Manager, explained that Geeslin's unearned wellness time was not in accordance with Morrison's wellness policy, and that Mottern had not been authorized to award unearned wellness time. (Doc. 18, Ex. 1 at ¶46.)

Morrison has not produced evidence that articulates a legitimate, non-discriminatory reason for taking away Geeslin's vacation time and $200 per month bonus. In its brief, Morrison argues the $200 bonus and additional vacation time were unearned

and unauthorized, and no other employee received it.  (*Id.*)  However, Morrison has offered only argument, and has not offered any evidence that Mottern did not have the authority to award Geeslin the $200 bonus or additional vacation time.  Morrison's attorneys' assertions that Mottern did not have such authority do not constitute evidence. Although Morrison's burden is only a "burden of production," *see Texas Department of Community Affairs v. Burdine*, 819 F.2d 1036, 1042 (11th Cir. 1987), Morrison has offered no probative evidence that Mottern did not have the authority to award Geeslin a bonus or vacation time.  In its brief, Morrison cites to Geeslin's own deposition testimony "that DJ [Mottern] did not have the authority to change anything."  (Doc. 18, Ex. 3 at 94.) Even assuming that this statement would satisfy Morrison's burden, Geeslin's testimony refers to being denied a raise, not having her bonus or vacation time taken away.  "The defendant's burden under McDonnell Douglas is to **produce evidence** that articulates a legitimate non-discriminatory reason for the action at issue and that frames the factual issue with sufficient clarity to give the plaintiff a full and fair opportunity to demonstrate pretext."  *Feazell v. Tropicana Products, Inc.*, 819 F.2d 1036, 1042 (11th Cir. 1987) (emphasis added).[11]

---

[11]Of course, assuming defendant offers evidence that Mottern did not have authority to award Geeslin a bonus at trial, Geeslin has the burden of showing that Morrison's articulated reason is a pretext for unlawful retaliation.  The court notes that Geeslin has not yet offered evidence that Morrison's reason is pretextual.  Geeslin's prima facie case, by itself, is insufficient to establish pretext.

### C. Negligent Hiring, Training, Supervision and Retention

The claim of negligent supervision and training is predicated on the underlying tortious conduct of an employee. *Stevenson v. Precision Standard, Inc.*, 762 So.2d 820, 824 (Ala. 1999). An employer is liable for the intentional torts of its agent only in the following circumstances: (1) if the wrongful acts were committed in the line and scope of the agent's employment; or (2) if the acts were taken in furtherance of the business of the employer; or (3) if the employer participated in, authorized, or ratified the wrongful acts. *Id.* (citing *Potts v. BE & K Construction Co.*, 604 So.2d 398 (Ala.1992)). Mottern's alleged sexual harassment, invasion of privacy, and assault and battery were clearly not in the line and scope of his employment or in the furtherance of Morrison's business. Therefore, Morrison can be held liable for Mottern's torts only if Morrison participated in, authorized, or ratified the wrongful acts.

In order to show that the employer either implicitly "ratified" or "tolerated" sexual harassment by one of its employees, in addition to proving the underlying tortious conduct of an offending employee, a complaining employee must show that her employer:

> (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation.

*Id.* (citing *Potts*, 604 So.2d at 400). Geeslin has not offered any evidence that Morrison had knowledge of Mottern's tortious conduct, or that Morrison knew or should have

known that Mottern's conduct constituted sexual harassment or a continuing tort.[12]  In fact, Geeslin admits that the first time that she notified Morrison of Mottern's conduct was November 11, 2004.  (Geeslin dep. at 186-88, 197-202, 234-35.)  Once Morrison did have knowledge of Mottern's conduct, it took adequate steps to remedy the situation. Menard immediately returned Geeslin's call, traveled to Birmingham, ensured that Geeslin would not have to work with Mottern, investigated Geeslin's complaints, and terminated Mottern.  Geeslin has simply not produced sufficient evidence to hold Morrison liable for Mottern's intentional torts.  Consequently, summary judgment is due to be granted as to Geeslin's claim for negligent hiring, training, supervision, and retention.

## IV.  CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute as to Geeslin's hostile work environment and negligent hiring, training, supervision, and retention claims, and defendant is entitled to judgment as a matter of law.  Because Morrison has not produced evidence articulating a non-discriminatory

---

[12]At oral argument, Geeslin's attorney argued for the first time that Morrison had notice of Geeslin's harassment because Jack Wilder was a supervisor, and he was present when Mottern grabbed Geeslin's breasts and pulled her panties.  "Actual notice is established by proof that management knew of the harassment."  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002).  Geeslin has not established that Wilder was "management."  Geeslin's only evidence that Jack Wilder was even a supervisor consists of several portions of Geeslin's deposition, where she states that he was a supervisor.  Therefore, Geeslin has not established that Wilder's knowledge may be imputed to Morrison.  However, even assuming Wilder's knowledge is imputed to Morrison, Morrison responded to the only incident seven days after it occurred. (Doc. 19 at 11-12.)

reason for taking away Geeslin's $200 per month bonus and vacation time, the court finds that there is an issue of fact as to Geeslin's retaliation claim on those issues.  An order granting in part and denying in part Morrison's Motion for Summary Judgment, (doc. 18), will be entered contemporaneously with this opinion.

**DONE**, this the 13th day of August, 2007.

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE